necessary. Since the abolition of forms of actions by the Code, a plaintiff may simply state the facts upon which he claims relief, and, if the facts stated are sufficient to authorize relief, his complaint cannot be challenged as not in any particular form. The complaint in this case alleges a parol contract to convey land unenforceable by the statute of frauds, a repudiation of that oral contract by the promisor, the payment of money and the performance of labor and service upon the faith of said contract by the plaintiff, and seeks to recover therefor. These allegations would seem to contain all the allegations necessary to a cause of action upon the contract which the law implies, where services are rendered under a contract void by the statute of frauds which the promisor refuses to fulfill.

The defendant further objects that some tax had not been paid which it was a part of the plaintiff's obligation under the contract to pay. That was the tax for 1906. In May, 1907, when the contract was repudiated by the defendant, no objection was raised that this tax had not been paid. If her refusal to perform had been upon that ground, the tax might then have been paid by the plaintiff. After the absolute refusal of the defendant to perform, the plaintiff was not bound to proceed further in the making of repairs or in the performance of his part of the contract before he could seek to recover for the money already expended in the course of performance on his part.

We are of opinion, therefore, that a sufficient cause of action was alleged, and that proof was offered sufficient to make a question of fact for the jury upon the plaintiff's right to recover. Plaintiff should probably allow as against his claim the fair value of the rental of the premises while he was occupying the same. As this implied promise is raised, for the reason that the court will not allow the statute of frauds to be made an instrument of fraud, the underlying principle would allow a recovery only for the moneys equitably due from the defendant. It may be that the plaintiff should have offered proof as to the fair rental value of these premises. But upon this question we pass no opinion. As the question was not raised by the motion for a nonsuit, his failure to offer such proof in any event should not have caused the dismissal of his complaint.

Judgment should, therefore, be reversed and a new trial granted, with costs to appellant to abide the event.

Judgment reversed and new trial granted, with costs to appellant to abide event. All concur.

---

GUEST v. CITY & COUNTY CONTRACTING CO.

(Supreme Court, Appellate Division, First Department. December 17, 1909.)

1. CORPORATIONS (§ 432*)—OFFICERS AND AGENTS—AUTHORITY—EVIDENCE.

In an action to recover the price of 90 manhole castings, which plaintiff claims he was authorized to purchase in performing part of a construction contract made by defendant with a railroad company, evidence *held* not to show that the railroad company's assistant engineer, who directed

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plaintiff to purchase the castings, had authority to direct their purchase for defendant, or otherwise represent it, except to approve the work.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 432.*]

2. CORPORATIONS (§ 406*)—OFFICERS AND AGENTS—AUTHORITY—CONTRACTS.

That defendant upon contracting to do certain construction work for a railroad company agreed to permit that company's engineers to supervise and approve the work did not authorize such engineers to make a new contract with defendant's subcontractors as to the amount of material purchased for the work, and that certain material could be bought at a lower price if all of such material needed were purchased at one time did not authorize them to direct the purchase of more than defendant had authorized to be purchased.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 406.*]

Houghton, J., dissenting.

Appeal from Trial Term, New York County.

Action by Guy M. Guest against the City & County Contracting Company. From a judgment for plaintiff and an order denying a motion for new trial, defendant appeals. Reversed, and new trial granted.

Argued before INGRAHAM, McLAUGHLIN, HOUGHTON, LAUGHLIN, and SCOTT, JJ.

George S. Graham (Ralph Polk Buell, on the brief), for appellant.
James D. Fessenden, for respondent.

LAUGHLIN, J. The plaintiff recovered a verdict against the defendant for the sum of $4,944.55, being the purchase price of 90 manhole castings and 90 manhole iron pans which he claims to have been duly authorized to purchase for the defendant but which it refused to accept, together with a commission of 15 per centum on the purchase price for his services, and interest on both items. On the 25th day of April, 1904, the New York, Westchester & Boston Railway Company entered into a contract in writing with one Charles H. Smith for the purchase of a right of way where not theretofore acquired, and the construction of a railway on the main line of the company's right of way between 177th street New York and Portchester in accordance with plans, profiles, and specifications which were annexed to the contract. Smith assigned the contract to the defendant. On or prior to the 2d day of July, 1906, the plaintiff, evidently being desirous of obtaining a contract for part of this work, interviewed one Putnam and one Tatnall, who were consulting engineers for the railway company. They pointed out to him on a blueprint the work that they contemplated doing, and indicated it by a yellow line thereon. The blueprint showed that 15 manholes would be required on that part of the work which was ready to be proceeded with at once, and that 26 would be required on that part of the work inclosed by the yellow lines, on part of which, however, the grading had not been completed, and therefore that part was not ready for the electrical work. The plaintiff thereupon made a formal proposal in writing to the defendant under date of July 2, 1906, as follows:

"We propose to lay the vitrified clay conduits complete with incasing concrete and build all manholes with appurtenances thereto, as per plan shown

us for fifteen per cent. above cost, said cost to include everything except the clay conduits proper which we are to receive from you at the dock. Work to be begun as soon as your contractors excavate the necessary trenches ready for the duct work. We would appreciate your formal acknowledgment of this letter, if the above statement is in accordance with your understanding of our verbal agreement. Thanking you for the contract, we beg to remain with respect."

The defendant the next day accepted the proposal in writing, as follows:

"We beg to acknowledge receipt of your favor of July 2nd, making a proposition to lay the electrical ducts in the position pointed out by Messrs. Putnam and Tatnall today for fifteen per cent. above the actual costs, including the material with the exception of the ducts themselves. Your proposition is satisfactory and accepted. You are authorized to go on with the work at once."

The plaintiff purchased and laid the conduits, and was paid both the purchase price thereof and the percentage for his services specified in the agreement. In the complaint he alleges: That between the 3d day of July, 1906, and the 27th day of April, 1907, he did "work of the kind mentioned" in his proposal of July 2, 1906, "for and at the request of the defendant, and furnished in connection therewith labor and material. That in or about July, 1906, the defendant requested plaintiff to order and purchase from the American Brake Shoe & Foundry Company, to be used in the prosecution of the work herein referred to, 90 manhole castings and 90 manhole iron pans, at the price of three thousand seven hundred and eighty-eight and $^{58}/_{100}$ ($3,788.58) dollars and to pay for the same, which plaintiff did." The plaintiff admitted as a witness in his own behalf that he understood that the work in his original contract called for only 15 manholes, and that he received blueprints for the installation of only 15 manholes. He also testified that he "was never positively directed to build any number in excess of 15 manholes. Of course, as a contracting proposal as a contractor we were always making aim for the entire improvement which they told us would be ultimately constructed." The plaintiff knew that considerable similar work remained to be done, and it appears that 90 manholes would be required to complete the contract work embraced in the contract between the railway company and Smith, which had been assigned to the defendant. It is quite clear that the original contract between the plaintiff and defendant did not require that he furnish 90 manholes and 90 manhole iron pans and I do not understand that the learned counsel for the respondent contends that it did. It is to be fairly inferred from the allegation of the complaint herein quoted that the theory of the plaintiff is that a new contract was made for these manholes in the month of July, 1906. Upon the trial, no evidence was presented tending to show that any new contract was negotiated directly between the plaintiff and the defendant. The plaintiff relies upon an order given by one Flynn, who was an assistant to the consulting engineer Putnam, for the 90 manholes and 90 manhole iron pans, and it is claimed that Flynn had implied authority from the defendant to authorize the plaintiff to purchase the same. This is based upon testimony showing that Putnam on introducing Flynn to the plaintiff informed the plaintiff that he should take his

orders from Flynn, and upon the testimony of the plaintiff, which is controverted by that of Flynn, to the effect that Flynn directed him to order the manholes. The plaintiff, according to his own testimony, was informed by Putnam on or before the original contract was made between the plaintiff and the defendant that Flynn was one of his office force, and he further testified that, after the contract was made, Putnam informed him "that we would receive orders from Mr. Flynn"; that Flynn was on the work and inspected the work which the plaintiff did in laying the conduit in concrete; that the only persons he came in contact with in doing the work were Putnam and Flynn; and that at the outset Putnam told him to take his orders from Flynn and that Flynn would have charge of his contract.

It appears by the testimony of an employé of the plaintiff, who supervised the work for him, that no one inspected the work for the defendant, but that Flynn was there from two to three weeks, and stated that he was an inspector for the railway company and appointed a day inspector who remained constantly on the work, and that the day inspector O. K.'d the plaintiff's bills, and that, after being O. K.'d by the witness representing the plaintiff, they were sent to the plaintiff's office, and then presented to the defendant. Flynn, called as a witness for the plaintiff, testified that he also O. K.'d some of the bills, but that this was done to show the chief engineer that the work was done in accordance with the plans and specifications which he had given to the plaintiff, but that it had no reference to the price of the material. It appears that the bills were also O. K.'d by the chief engineer of the railway company. The plaintiff also testified that some time in July, 1906, Flynn brought to him a blueprint drawing, showing the details for the manhole castings, and that at Flynn's suggestion he sent it to the American Brake Shoe & Foundry Company to get a price on the manholes; that he subsequently received a letter from the foundry company, under date of July 18, 1906, stating that, if the order were placed for 125 manhole castings, "we can name you a price delivered f. o. b. cars Mt. Vernon, N. Y., of 2½¢ per lb.," and that, as it would be necessary to have the pattern made outside, they could not do better than deliver 30 within a month from the receipt of the order, and that it would be necessary to give an order for the number specified to enable the company to give the quotation specified, for the reason that the pattern would cost between $120 and $140; that he communicated the contents of this letter to Flynn, who requested that he ascertain the lowest number of castings that the company would make without charging for the pattern, and that, in reply to a further inquiry, he received a letter, under date of July 24, 1906, stating, in effect, that the foundry company would furnish 90 manholes at the price previously given, without charging for the patterns, on the understanding that 30 only would be for immediate delivery, and that the remaining 60 would be made up from time to time and held subject to shipping orders; that he also communicated the contents of this letter to Flynn, who said that it "was entirely satisfactory," and told him to order the castings; that prior to this time he talked with both Flynn and Putnam concerning the number of manholes that the company would probably

want, and that each stated to him that it would want about 125; that, after Flynn was informed by him that the manholes had been manufactured and were ready for delivery, Flynn stated that "they did not want them at that time," and told him to leave them where they were for the present; that he received a bill from the foundry company and paid for the castings by giving a note for 90 days for the purchase price, and interest, which he paid on the 22d day of July, 1907; that on the 2d day of December, 1907, he wrote the defendant, asking for instructions as to whether he should direct the foundry company to keep or ship the castings for the account of the defendant until ordered shipped; that the defendant replied on the next day, referring to prior correspondence between the parties, and stating that the position of the defendant was fully set forth in a letter under date of November 29th—which is not in the record—and that the defendant had no directions to give regarding the castings, as it did not consider that it had any interest in them, and that the payment made on account of material and his services were by checks of the defendant. The plaintiff's chief engineer testified that in the summer of 1906 the plaintiff was requested by the defendant to present a bill for some or all of the work done under the contract; that he took the bill to the railway company's office and delivered it to Mr. Flynn, who corrected and approved it, and then went into another room, and in about five minutes brought a check of the defendant back for the amount of the bill and delivered it to the witness; and that he likewise received a check of the defendant for the final bill for the other contract work at the hands of Flynn. In behalf of defendant it was shown that there was no connection between its office and that of the railway company.

The contract between Smith and the railway company, of which the defendant took an assignment, provided that the work should be done "in the best possible manner agreeable to the directions (which directions shall always be given in writing) of the engineer of the company"; that the work should be done "in a skillful and workmanlike manner, in accordance with the specifications hereunto annexed or the written instructions of the engineer of the railway company, and all said material and construction shall be in accordance with the specifications hereto annexed, and to such plans, levels, and surveys as shall from time to time be given by the engineer of the railway company. It is to be understood and agreed that the work shall be done under the direction and constant supervision of the engineer of the railway company, whose determination and decision upon all questions involving measurements or calculations of the quantities of the several kinds of work performed under the several provisions of this contract, or the quality or grade of such work, or of the materials used, shall be final (here follows provision for arbitration in case of dispute). * * * It is further understood and agreed that all material and workmanship shall be inspected by the engineer of the railway company, and accepted or rejected under a fair and reasonable interpretation of the terms of this contract and the specifications hereunto annexed, and any such materials or workmanship which shall be rejected shall be replaced and made good by the contractor, and the contractor

shall replace such material or workmanship with proper material and work to the satisfaction of the engineer of the railway company. It is understood, however, that the contractor may call upon the engineer at any time to pass upon any material or workmanship and it shall be the duty of the engineer immediately to accept or reject such work and material."

The president of the defendant testified, in effect, that he let the contracts for the defendant, and that the engineers of the railway company had no authority with respect thereto, excepting to supervise the work under the contract, plans, and specifications; that he required the O. K. of the railway company's engineer before paying bills as a protection to the defendant under its contract with the railway company; and that his company had no engineer on the work.

Flynn testified that it was his duty to design the cover for the manholes, and that, by direction of Putnam and without communicating with the defendant, he submitted it to the plaintiff to get bids on the castings; that he did not authorize the plaintiff to order 90 manhole castings, and that he had no authority to give him any order in the premises, excepting to approve the price, which he did; that his first information that the plaintiff had ordered more than 15 manholes, the number embraced in his contract, was when he was notified that they were ready for inspection at the foundry, and, on going there to inspect them, he found 45; that he was there merely to see that they were properly manufactured and of proper material; that, after inspecting the manholes, he wrote a letter to the plaintiff under date of September 27, 1906, stating that it would be necessary to have new covers made for the 45 bodies already cast, making them one-quarter of an inch smaller in diameter and one-eighth of an inch thinner at the bearing surface, and that, when the bodies are cast for the balance of the order, the patterns should be made large enough to fit the covers already cast, and that, when 15 new covers were ready for inspection, the foundry company was to notify him to send an inspector for final approval. This evidence tends to corroborate the testimony of the plaintiff that Flynn at least knew that he was placing an order with the foundry company for more than the 15 manholes required under his contract. The jury were left to find on this evidence, and have found, that Flynn had implied authority to make the contract with the plaintiff for the 90 manholes. We are of opinion that there was no evidence to warrant the submission of that question to the jury. The plaintiff made his contract with the defendant, and there is no evidence tending to show that the defendant held out Flynn as having any authority to represent it, other than in approving the contract work, and in that he was acting, not for the defendant, but for the railway company; but for its own protection, and probably to save the expense of a supervising engineer, the defendant left it to the engineers of the railway company to direct and supervise the performance of the work. That, however, gave the engineers no authority to make any new contract for the defendant. The mere fact that the manholes could be obtained at a lower price by ordering all that were required on the entire work at one time did not confer authority upon the engineers to let

the contract for the defendant. There is, as has already been seen, evidence indicating that the work which the plaintiff was shown and which was inclosed by the yellow line on the blueprint would involve the placing of 26 manholes, and therefore it may be a question as to whether the purchasing of 26 manholes was embraced within his contract, but this question can be more satisfactorily disposed of on a new trial.

It follows that the judgment and order appealed from is reversed and a new trial granted, with costs to appellant to abide the event.

INGRAHAM, McLAUGHLIN, and SCOTT, JJ., concur.

HOUGHTON, J. I dissent. I think Flynn had actual or implied authority to direct the plaintiff to purchase on behalf of the defendant the entire ninety manholes. Of course, the plaintiff is not entitled to his commission of 15 per cent. of the costs of manholes not used on his contract; but he is entitled to recover from the defendant the amount which he paid for the manholes which were not used.